Troy BURRIS, Plaintiff-Appellant,

v.

WILLIS INDEPENDENT SCHOOL DISTRICT, INC., Defendants-Appellees.

No. 82–2204.

United States Court of Appeals, Fifth Circuit.

Sept. 6, 1983.

---

Larry Watts, Houston, Tex., Laura E. Oren, Houston, Tex., for plaintiff-appellant.

Kelly Frels, Houston, Tex., Janet Little Horton, Timothy T. Cooper, Houston, Tex., for defendants-appellees.

Before THORNBERRY, GEE and WILLIAMS, Circuit Judges.

THORNBERRY, Circuit Judge:

### I. *Introduction:*

Troy Burris appeals the grant of a directed verdict on his section 1983 claim against the Willis Independent School District (WISD). The trial court held that the failure to renew Burris' employment contract violated neither his procedural due process rights, nor his first amendment right of free association. We affirm in part, and reverse in part. 537 F.Supp. 801.

### II. *Facts and Disposition Below:*

Burris was employed by the WISD as vocational director from August 1978 until July 1980. Like all other professional personnel at the WISD, Burris was employed under one-year term contracts. His initial contract was renewed. However, when his contract came up for renewal in February 1980, the six-member School Board divided equally, and the matter was postponed until the next Board meeting. The political atmosphere at Willis at that time was highly partisan, with two groups vying for control of the School Board. Although seven trustees usually serve on the Board, Burris alleged in his complaint that political scheming by three members of the "new line" faction resulted in the resignation of one member of the "old line" faction, thereby resulting in a deadlocked Board. Three of the defendants in this action, Alston, Ozment, and Reeves, comprised the "new line" faction that voted against renewing Burris' contract at the February 1980 meeting. By April 1980, when the subject of renewal next arose, three more defendants, Atkin-

son, Lee, and McKeehan, had been elected to the Board, thus replacing all but one member of the "old line" Board, Straughter. At the April meeting, all the trustees, except for Straughter, who abstained, voted against renewing Burris' contract, despite favorable recommendations on two earlier annual ratings by Superintendent Todd, Burris' supervisor. Todd had also recommended that Burris continue to be employed at the school. After declining to renew his contract, the Board refused to grant Burris a grievance hearing.

In his complaint, Burris alleged deprivations of his property and liberty interests without due process, in violation of the fourteenth amendment. Burris also alleged that he was the victim of a local political struggle, and that the new Board refused to renew his employment contract in retaliation for his associations with the old Board members. His complaint further alleged that he was terminated so that the new Board might hire Ruth Castleschouldt, an unsuccessful candidate for his position under the old Board, and a prominent supporter of the "new line" faction. Burris named as defendants the school district itself, as well as the "new line" Board members in their individual and official capacities. Following a thirteen-day trial, the district court granted the defendants' motion for a directed verdict under Fed.R.Civ.Pro. 50(a) on all issues, concluding that "reasonable men [and women] could not arrive at a contrary verdict."

### III. *Discussion:*

Our standard of review on appeals from a grant of directed verdict is that set out in *Boeing v. Shipman,* 411 F.2d 365 (5th Cir. 1969) (en banc):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in

favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.* at 374–75 (footnote omitted).

A. *Property Claim:*

█ It is well settled that before it may pass on a procedural due process claim, a federal court must first determine whether the interest alleged to have been infringed amounts to "life, liberty, or property" under the fourteenth amendment. We begin, therefore, by determining whether Burris had a property interest in his continued employment in the WISD. The Supreme Court has emphasized that "[t]he hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982). *See also Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 735–36, 42 L.Ed.2d 725 (1975); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972).

The undisputed facts show that Burris was employed pursuant to section 23.28 of the Texas Education Code. Under section 23.28, the maximum terms of employment of school officers and teachers are governed by the school district population. For districts such as the WISD, the statute provides that the term of a contract may not exceed three years. Texas Educ.Code Ann. § 23.28(b) (Vernon 1972). Burris was employed under a twelve-month contract. Under his contract employment, Burris' interest in his continued employment expired on June 30, 1980.[1]

The Supreme Court has recognized that the policies of school boards may give rise to an *implied* contractual right to reemployment. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972). However, an examination of applicable Texas law leads us to conclude that no such property right may be implied here. The controlling Texas case on implied property rights in the renewal of employment is *Hix v. Tuloso-Midway Independent School District,* 489 S.W.2d 706 (Tex.Civ.App.—Corpus Christi, writ ref'd n.r.e.). Addressing a claim by a teacher against a school that had refused to renew his contract in violation of a *de facto* tenure policy, the court stated:

The attorney for the School District, in a letter, dated May 2, 1968, addressed to the State Commissioner of Education, stated: "The policy then and now is to reward satisfactory work by extending their (teachers') contracts, but this has been done by action of the Board each March". Plaintiff says that this statement is proof of a *de facto* tenure policy that clearly implies promise of continued employment. We do not agree. The published school board Policies in effect at all times pertinent to this appeal never expressed anything indicating that it would renew any teacher contract when it expired; furthermore, such policies expressly limited the term of teachers' contracts to two years. The mere fact that a teacher has been rehired each year for a period of years does not constitute any evidence that the School District had impliedly contracted with the teacher to re-

---

1. Any claim by Burris that he had a property interest under the Texas continuing contract law, Texas Educ.Code § 13.101 *et seq.* (Vernon 1972), is foreclosed by the fact that the WISD has never adopted its provisions.

new the contract every year. Successive renewals of a teacher's contract with admissions by school representatives that such renewals were the reward for satisfactory work does not constitute evidence of *de facto* tenure policy of the school district, or of any implied agreement on the part of the school district that a teacher has a contractual right of renewal so long as the work performed is satisfactory.

. . . . .

The tenure policy of the School District that plaintiff says was in effect, be it express, *de facto* or implied, would be contra to Article 2781, and void, as it would have generated an automatic teacher contract renewal procedure, the effect of which would have resulted in a term that was not limited by three years but by the failure of the teacher to render satisfactory service. *Fromen v. Goose Creek Independent School District,* 148 S.W.2d 460 (Tex.Civ.App.—Galveston 1941, writ dism'd judg. corr.). We hold that the Tuloso-Midway Independent School District and its Board of Trustees did not, in March, 1968, have in force and effect, an express, *de facto* or implied teacher contract renewal policy, and that it is not estopped to deny the same. *Id.* at 710.[2]

It is clear that, under Texas law, a school district which did not adopt the continuing contract law, see note 1, *supra,* may not adopt its own tenure plan for teachers employed under section 23.28. *See Guerra v. Roma Independent School District,* 444 F.Supp. 812, 818 (S.D.Tex.1977). We hold that Burris did not have a property right in the renewal of his contract. Lacking such a right, Burris was not entitled to a due process hearing. *See Siler v. Brady Independent School District,* 553 F.2d 385, 388–89 (5th Cir.1977).

**B.** *Liberty Claim:*

Burris makes two non-frivolous claims that he has been deprived of "liberty" in violation of the fourteenth amend-

ment. He first claims that the public presentation of an allegedly defamatory letter at an open Board meeting injured his standing in the community. Second, he alleges that the Board's consideration at a closed meeting of defamatory information contained in the "Parker files" infringed on his liberty.

In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court held that mere refusal by the state to rehire a person, without more, did not implicate any liberty interests. 92 S.Ct. at 2708. Moreover, reputation alone is not a constitutionally protected interest, even though state law may create a right to damages for defamation. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *White v. Thomas,* 660 F.2d 680, 684 (5th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982). However, if in refusing to rehire him, the state makes charges against an employee that "might seriously damage his standing and associations in his community," by calling into question his integrity or morality, different considerations come into play. In such cases, the state must accord the employee an opportunity to refute the charges against him before the appropriate state body. 92 S.Ct. at 2707. Similarly, if the state, "in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities," 92 S.Ct. at 2707, due process also demands that the employee be given an opportunity to disprove the charges against him. We must examine, then, whether the Board implicated Burris' "good name, reputation, honor, or integrity," or whether it stigmatized him in a way that "foreclosed his freedom to take advantage of other employment opportunities." *See Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977); *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 1163, 47 L.Ed.2d 405 (1976); *White v. Thomas,* 660 F.2d at 684.

**2.** Article 2781 was the predecessor to section 23.28 of the Texas Education Code. *See* Texas Educ.Code Ann. § 23.28 historical note (Vernon 1972).

In the instant case, Burris claims that he was stigmatized by Alston's "dramatic" reading of a letter. The letter, which was written by two teachers at the school, contained a request that a certain course in the Vocational Agriculture Department be retained, and that another course be added to the curriculum. Burris was not mentioned in the letter. Burris claims that by reading the letter, Alston created the false impression that he was acting against the expressed wishes of the teachers in the Agriculture Department.

We reject this argument. The letter was presented by Alston in connection with her inquiry into proposed changes in the Agriculture Department's curriculum. It did not directly reflect on Burris' professional ability. We construe this incident as revealing a certain lack of communication between Burris and the teachers. The record shows that the teachers presented their wishes to Burris at an earlier meeting, but that Burris dissuaded them from pursuing their goals because he believed that other courses had priority in the Department. This explains why Burris did not present their concerns to the Board. We fail to see how presentation of this letter tarnished Burris' "good name, reputation, honor, or integrity." Burris, as the vocational director, had the duty to present his assessment of the Department's requirements to the Board. The Board has an independent duty to evaluate the school's curriculum. For us to hold that a member of the Board was not entitled to confront Burris and challenge his conclusions without fear of being sued for depriving him of his liberty would tie the hands of school boards and prevent them from fulfilling their vital role in the community.

Moreover, we do not see any direct or implied stigmatization in either the letter itself or in the manner in which it was presented. We have previously held that an employer's rating of an employee's honesty as "unsatisfactory" was not stigmatizing. *Huffstutler v. Bergland,* 607 F.2d 1090, 1092 (5th Cir.1979). Certainly, the actions by Alton at the Board meeting amounted to far less than a charge of dishonesty. More to the point, the record

shows that shortly after he left Willis, Burris was able to obtain employment as an administrator in a nearby school district. Finally, the mere fact that the underlying actions could give rise to a state tort claim is not sufficient by itself to support a constitutional due process claim. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 1165–66, 47 L.Ed.2d 405 (1976).

Burris next claims that certain information contained in a file owned by Mr. Parker, the school's principal, contains false and defamatory information, and deprived him of his liberty interest. That information was never made public, and was only read by the Board at a closed meeting.

▮ We have previously held that the mere presence of defamatory information in confidential personnel files does not amount to a violation of one's liberty rights. *See Walker v. Alexander,* 569 F.2d 291, 294 (5th Cir.1978); *Ortwein v. Mackey,* 511 F.2d 696, 699 (5th Cir.1975); *Sims v. Fox,* 505 F.2d 857, 864 (5th Cir.1974) (en banc), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 678 (1975). However, where the information contained in the allegedly confidential files is clearly false, and there is a possibility that the information will not be kept confidential, we have held that an evidentiary hearing is required to determine the issues of confidentiality and the potential prejudice to the plaintiff's standing in the community and to his employment opportunities. *Swilley v. Alexander,* 629 F.2d 1018, 1022 (5th Cir.1980).

Mr. Parker, the owner of the confidential files, testified at trial that the contents of the file were never discussed by anyone other than the people who were responsible for them. Burris, however, attempted to prove that the alleged defamatory information in the file was made public by pointing to the testimony of one of the Board members, Mrs. Roarke. She testified that she had heard that Burris had a reputation of "lik[ing] the ladies." Assuming that Roarke obtained this information from the files, we fail to see how such a reputation could ever prejudice a person's standing in the community in today's society. More-

over, Mrs. Roarke next testified that she "never did see Mr. Burris do anything that was not becoming to a gentleman." We have not been able to locate in the record any instances that show that the alleged defamatory information in the Parker file was not kept confidential. Through Mr. Parker's testimony, the defendants have raised a rebuttable presumption that the information in the file was kept confidential. Since Burris failed to overcome that presumption of confidentiality, we conclude that the trial court was correct in concluding that the information in the files did not deprive Burris of any liberty interest.[3]

### C. First Amendment Claim:

Burris claims that the Board failed to renew his contract in retaliation for his exercise of his first amendment rights of free association and speech. Briefly, Burris alleges that the new Board decided not to renew his contract because it associated him with the majority of the old Board and Superintendent Todd. The district court rejected this claim, holding that the evidence established that Burris' alleged association with the majority of the old Board amounted to nothing more than friendship, and that friendship was not a protected first amendment activity.

The court first stated that "[a]t trial Plaintiff was unable to show any relationship between himself and others except association in its simplest form—friendship. There was no showing of combination for any political purpose, or for the furtherance of any particular school program, policy or objective." The court then concluded that it was convinced "that the Constitution will not be interpreted to protect mere personal affinity in cases where the association bears

no relationship to the expression of beliefs or ideas.... Protection of simple friendship would unreasonably and pervasively limit the exercise of legitimate governmental prerogative. 'Association' in this sense certainly does not invoke an interest which lies close to the core of the first amendment." [4]

■ Burris' claim under the first amendment is not defeated by the fact that he had no tenure. "Even though he might have been discharged for no reason whatsoever, and had no constitutional right to a hearing prior to the decision not to rehire him, ... he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms." Mt. Healthy City School District v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977) (citations omitted).

■ Our analysis of Burris' first amendment claim is governed by the burden shifting method of proof set out by the Supreme Court in Mt. Healthy. Under that method, the plaintiff has the initial burden of proving that his conduct was constitutionally protected, and that this conduct was a "substantial" or "motivating" factor in the decision not to renew his contract. 97 S.Ct. at 576. Once the plaintiff meets these burdens, the burden of proof shifts to the defendant School Board to show "by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." Id. See Smith v. Hightower, 693 F.2d 359, 366 n. 18 (5th Cir.1982).

---

**3.** Burris' remaining liberty claim may be easily disposed of. Relying on St. Ann v. Palisi, 495 F.2d 423 (5th Cir.1974), Burris claims that he had a liberty right to be free from punishment for the wrongs of others, here, members of the "old line" Board. In Palisi, we disapproved of the suspension of students for the misconduct of others. Public school students, of course, have a property right to attend school. Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1972). Thus, the punishment in Palisi amounted to a deprivation of a constitutionally protected right. As we have already held, how-

ever, Burris possessed no property right in his continued employment.

**4.** The district court also held that Burris' first amendment claim based on a letter he sent the Board in defense of his actions was not actionable because a majority of the new Board had already voted not to renew Burris' contract before they ever saw the letter. Since we conclude that the district court erred in its holding that Burris' freedom of association claim was not actionable, we need not reach this issue.

#### i. *Constitutionally Protected Conduct:*

██ It is clear from the district court's memorandum that the court believed that Burris' claim of freedom of association amounted merely to a claim of friendship with Superintendent Todd. The court then held that the relationships at issue here were not protected first amendment interests. We disagree.

The question whether specific conduct or speech is protected by the first amendment is ultimately a question of law. In the public employment area, such an inquiry must be the result of balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern ... [with] the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). The trier of fact plays a substantial role in aiding the court in determining the ultimate legal issue. *See Brown v. Bullard Independent School District,* 640 F.2d 651, 653 (5th Cir.1981); *Van Ooteghem v. Gray,* 628 F.2d 488, 492 (5th Cir.1980), *aff'd in part, remanded and vacated on other grounds,* 654 F.2d 304 (5th Cir.1981) (en banc), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1255, 71 L.Ed.2d 447 (1982).

In *Pickering,* the Supreme Court analyzed the interests of teachers expressing their views on matters of public interest with the conflicting governmental interest in regulating their conduct. The Court recognized the legitimate state interest in maintaining discipline by immediate supervisors, harmony among fellow workers, and the personal loyalty and confidence necessary to close working relationships. 88 S.Ct. at 1735–36. The Court accordingly outlined two considerations relevant to any first amendment analysis: (1) whether the employee's statements were critical of a person "with whom ... [he] would normally be in contact in the course of his daily work as a teacher," so that such criticism might impede "either discipline by immediate supervisors or harmony among coworkers." 88 S.Ct. at 1735. The Court emphasized that the intimacy of the working relationship was a substantial factor in this consideration. 88 S.Ct. at 1735 n. 3. Speaking directly on the relationship between a teacher and a school board, the Court stated that these "employment relationships ... are not the kind of close working relationships for which it can persuasively be claimed that *personal loyalty* and confidence are necessary to their proper functioning." *Id.* 88 S.Ct. at 1735 (emphasis added). (2) the Court next analyzed the impact of the teacher's actions on school operations. *Id.* 88 S.Ct. at 1736. "The Court differentiated between the impact of critical statements on the working relationships of the speaker and his superiors or coworkers, and the impact of critical, and inaccurate, statements on school operations." *D'Andrea v. Adams,* 626 F.2d 469, 475 (5th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1365, 67 L.Ed.2d 345 (1981).

The district court in our case did not consider these two factors in its first amendment analysis believing as it did that Burris' conduct did not rise to first amendment associational activity. However, a teacher's right of freedom of association is closely akin to freedom of speech. *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). *See Guerra v. Roma Independent School District,* 444 F.Supp. 812, 819 (S.D.Tex.1977).

The record shows that Burris had expressed views on at least one local political issue involving a school practice. That issue involved the private use of school trucks by the Agriculture Department teachers. Allegations were made that the teachers had abused their privilege to use the trucks, and the old Board was deeply divided on this issue. Burris, supported by the majority of the old Board, had decided that the teachers would not be allowed to continue in their use of the trucks, and determined to take the trucks away from them. This irked the agricultural community. As Alston, who was the president of the new Board, testified: "[T]he community had the feeling that [Burris] was against Ag[riculture]. Their views of that were ... [based on] the fact ... [that] Mr. Burris wanted to have the pick-up trucks that the Ag department teachers drive ..., and it was his

suggestion to take those trucks away from the Ag teachers and also for the district not to pay the insurance."

This issue was a "bone of contention" among the members of the old Board. Alston testified that "some of the Board members, who seemed to be promoting Mr. Burris' idea to take the Ag trucks away, were trying to imply that these trucks . . . and the privileges were being abused." It is clear that Burris was supported by the majority of the old Board, and that the "new line" faction recognized this. Alston testified: "It was my understanding in the Board meeting that . . . [members of the old Board majority] were the ones that solicited . . . [Burris'] recommendation and his going out to get the figures and to find out what other districts did and to make a recommendation, and it appeared that he was in agreement that this should be done."

We have recently held that "a teacher's speech is not necessarily unprotected simply because it concerns internal operating procedures rather than issues of public importance." *White v. South Park Independent School District,* 693 F.2d 1163, 1168 n. 7 (5th Cir.1982) (citations omitted). *See Brown v. Bullard Independent School District,* 640 F.2d 651, 653 (5th Cir.1981) (teacher's conversations with principal, superintendent, and trustee members related conditions of employment, and remarks made at a faculty meeting were protected first amendment activities). The small population size of Willis is an added important factor in our analysis.[5] In such small communities, issues affecting local school matters can easily become issues of great public importance. The record shows a rivalry between two warring factions in Willis. Alston's testimony about Burris' stand on the question of the teachers' truck privileges shows that Burris supported one of the factions, and was considered by the other faction to be opposed to their views. Reaves, a member of the Board's "new line" faction, testified that "Mr. Burris felt that he was secure in his job as long as he had Richard Hargrave, Bridges Browder [members of the old Board majority], and Todd on his side." This

statement indicates that the new Board felt it knew which side Burris was on in the dispute between the Board members.

Viewing the evidence in the light most favorable to Burris, we conclude that the district court erred when it characterized Burris' relationship with members of the old Board as one of mere friendship. However, we cannot on the record before us hold that Burris engaged in protected first amendment activity. As noted above, the legal resolution of this issue depends on a factual resolution of the two *Pickering* factors. Although it is clear that the first factor, the need for a close working relationship, points in favor of finding a protected activity (because no such need exists between the Board and Burris, *see Pickering, supra* ), neither the district court nor the jury evaluated the impact of Burris' activities on the school's operations. Accordingly, we remand the case for further determination of this issue.

ii. *Substantial Factor in the Board's Decision:*

Our next inquiry is whether there is substantial evidence supporting the Board's claim that Burris' protected conduct, if it existed, did not play a substantial role in the Board's decision not to renew his contract. As already mentioned, there was evidence that Burris associated with members of the old Board majority on at least one of the political issues involving the school. One of the first acts by the new faction, upon gaining control of the Board, was to decide not to renew Burris' contract. Viewing the evidence under the standards of *Boeing v. Shipman,* we conclude that a reasonable juror could conclude that this decision was motivated to a substantial degree by Burris' protected activity.

iii. *Rebuttal Evidence:*

Burris should not receive a windfall for exercising his constitutional rights, and if independent reasons existed for the Board's decision not to renew his contract, his claim must fail. *Bowen v. Watkins,* 669 F.2d 979,

**5.** The 1980–81 Texas Almanac lists Willis' population as 1889.

987 (5th Cir.1982). Accordingly, "the *Mt. Healthy* analysis allows the defendants to show that the same decision would have been made absent the constitutionally protected activity." *Id.* Resolution of this issue requires the consideration of all relevant evidence by the trier of fact. *Id.* Since this case is on appeal from a directed verdict in favor of the defendants, the defendants will prevail only if the evidence *overwhelmingly* supports the result reached below. *See Boeing v. Shipman, supra.* The record does show that a majority of the Board appears to have had independent reasons for not renewing Burris' contract. Two members, Alston and Reaves, complained that Burris had low visibility in the community. There was testimony that the agricultural community was unhappy with Burris' performance over the trucks used by the teachers. Atkinson decided against renewing the contract because a member of the old Board, Straughter, had withdrawn his active support for Burris. Reaves testified that morale in the Agriculture Department was low because Burris showed no leadership, and the overall program was not growing. However, upon being questioned by Burris' attorney, Reaves admitted to possessing no knowledge of the state of the program before Burris' arrival. Reaves also testified that Burris was planning to cut some courses from the curriculum. However, in response to questioning, he stated: "It was a half unit or unit of something and it was going to add something to something. I don't know." We agree with Burris that this testimony establishes that Burris planned to shift some courses around, not to cut them out.

On the other hand, Superintendent Todd had given Burris a very good evaluation of his performance. For example, the evaluation described Burris' leadership as "out-

standing." It also stated that Burris had the respect of the faculty and the students, that he cooperated well with the administration, and that he succeeded in "ma[king] definite improvements in our already existing strong vocational program."

Reaves, however, stated that "Clayton Todd is not capable of evaluating anybody." [6] Of course, the Board was not required to accept Todd's recommendation. Under the school procedures, the decision whether to renew a teacher's contract is left entirely to the Board's discretion. However, in determining whether the Board failed to renew Burris' contract for an impermissible reason, we must evaluate the Board's decision in light of both its stated reasons for not renewing his contract, and all other evidence in the record relevant to his performance.

We conclude that the defendants failed to establish as a matter of law that they would not have renewed Burris' contract on grounds separate from his constitutionally protected conduct. Sufficient evidence exists in the record to permit a reasonable juror to conclude that the Board would have renewed Burris' contract *but for* his affiliation with members of the old Board. Therefore, the district court erred when it granted the defendants' motion for a directed verdict.

## IV. *Conclusion:*

Since we conclude that reasonable minds could reach different results on the first amendment issue, we REMAND the case to the district court on this issue only. We AFFIRM the judgment of the district court on the due process claims.[7]

---

**6.** Reaves also testified that "Clayton Todd was the worst son of a bitch that ever walked up here." Although he later retracted this statement, his real sentiment became a fact issue.

**7.** We wish to stress that the motion for directed verdict was granted after a thirteen-day jury trial. Under such conditions, a more appropriate approach by the district court would have been to hold its ruling until after the verdict,

and treat it as a motion for a judgment n.o.v. This would have avoided the resulting retrial, with its accompanying delay, expense, and the possibility of a second appeal to this court. *Malone & Hogan Hospital Foundation v. Boston Ins. Co.,* 378 F.2d 362, 363 (5th Cir.1967). *See Brunswick Corp. v. Sheridan,* 582 F.2d 175, 185 (2d Cir.1978); *Passwaters v. General Motors Corp.,* 454 F.2d 1270, 1272–73 (8th Cir. 1972).