Dr. Nolan L. KINSEY,
Plaintiff–Appellant,

v.

SALADO INDEPENDENT SCHOOL
DISTRICT, et al.,
Defendants–Appellees.

No. 89–1717.

United States Court of Appeals,
Fifth Circuit.

Nov. 2, 1990.

Lynn Wade Malone, Charles M. Mc-Donald, McDonald, Harmon & Malone, Waco, Tex., for plaintiff-appellant.

William C. Bednar, Jr., Austin, Tex., for defendants-appellees.

Before GOLDBERG, GEE and WILLIAMS, Circuit Judges.

GOLDBERG, Circuit Judge:

Dr. Nolan L. Kinsey ("Kinsey") was employed in Salado, Texas as Superintendent of Schools for the Salado Independent School District ("SISD"). Kinsey brought suit against the SISD, its Board of Trustees (the "Board") (the SISD and the Board will be collectively referred to as the "School District") and four members of the Board in their individual capacities to recover damages for violation of his constitutional right to freedom of speech and for violation of his right to due process of law under the Fourteenth Amendment to the United States Constitution. The district court granted the School District's motion for summary judgment on the due process claim. In the case at bar, the jury held for Kinsey on his First Amendment claim, but the district court granted the School District's Motion for Judgment Notwithstanding the Verdict, holding, as a matter of law, that Kinsey's speech was not protected by the First Amendment. REVERSED.

## FACTS AND PROCEEDINGS BELOW

The School District employed Kinsey as Superintendent of Schools from 1981 until the Board suspended him with full pay and benefits on September 10, 1988. Kinsey was employed under a written contract which was extended periodically. In January 1988, the Board of Trustees voted to extend Kinsey's contract for a two-year term, to end June 1990. That following May of 1988, school board elections were held and three trustee positions on the ballot were contested. The political atmosphere in Salado at that time was highly partisan, with two groups vying for control of the Board of Trustees.

Prior to the May 1988 elections, Kinsey had become politically aligned with the then majority of the Board, which included Board president Don Berry. Kinsey openly supported Berry's re-election, as well as the election of the two candidates who were essentially running on a "slate" with Berry (the "Berry Slate"). Prior to the election, Kinsey made many public statements concerning his views on the election, both in public meetings and in a local newspaper. Glen Hagler, an incumbent seeking election after appointment, Claude Hodge and Gary Bartlett ran against the Berry Slate of candidates. Candidates Hagler, Hodge and Bartlett subsequently defeated the Berry Slate. The newly elected Board members, together with incumbent Joe Barrentine, then formed a new majority on the Board.

Shortly after the election, the Board began to meet frequently in executive session to discuss Kinsey's contractual status with SISD. The Board was essentially split four members to three members in favor of terminating Kinsey's services. After an unsuccessful attempt to buy-out Kinsey's contract, the Board agreed to set aside the issue of Kinsey's contract until it conducted a review of Kinsey's performance in January 1989. In connection with this decision, the Board decided to issue certain directives or guidelines as to how the Board wanted Kinsey to conduct his job. Those directives were to form the basis for evaluating Kinsey's performance when the Board reviewed Kinsey in January 1989. The record indicates that a dispute existed among the Board members regarding Kinsey's compliance with these directives. The four-member majority generally felt Kinsey had rejected the spirit of the directives, while the remaining three members believed he had made every reasonable effort to comply with the directives. Following a meeting with the Texas Education Agency, during which the Agency administrator told the Board to work out their differences with Kinsey, the Board President scheduled a special meeting to discuss the "Termination and/or Suspension of Superintendent Contract." The Board met in an executive session on September 10, 1988, and then publicly voted four to three to suspend Kinsey with pay.

· In his complaint, Kinsey alleged deprivation of his property and liberty interests without due process of law, in violation of the Fourteenth Amendment. Kinsey's complaint further alleged that the new Board suspended him in retaliation for his public support of the Berry Slate during the Board elections. Following the School District's answer and discovery by the parties, the School District filed a motion for summary judgment. The district court granted the School District's motion on Kinsey's due process claims. The case proceeded to trial on Kinsey's First Amendment claims. The jury was properly instructed that they could find for Kinsey only if (1) he convinced them, by a preponderance of the evidence, that his state-

ments during the School Board election were a substantial or motivating factor in the Board's decision to suspend him, and (2) the School District failed to convince them, using the same standard, that they would have suspended Kinsey absent Kinsey's statements during the election. The jury returned a verdict for Kinsey, awarding him $250,000 in damages.

Following the trial, the district court granted the School District's Motion for Judgment Notwithstanding the Verdict, holding, as a matter of law, that Kinsey's speech had not addressed matters of public concern. The district court also found that even if Kinsey's speech did address matters of a public concern, the speech was still not entitled to constitutional protection because it was too disruptive to the efficient operation of his public employer to be afforded First Amendment protection. The Judgment Notwithstanding the Verdict did not attack the jury's factual findings that the School Board was motivated by Kinsey's participation in the election and that the Board would not have suspended Kinsey absent that conduct.

Kinsey appeals the adverse grant of the School District's Motion for Judgment Notwithstanding the Verdict on two grounds. First, Kinsey contends that the district court erred in holding that as a matter of law Kinsey's speech failed to address matters of public concern and was purely private in nature. Secondly, Kinsey claims that the district court erred in holding that, as a matter of law, Kinsey's speech and political activity were too damaging to confidential relationships and disruptive of the efficient functioning of his governmental employer to be afforded First Amendment protection. We agree with both claims and reverse the district court's grant of the Motion for Judgment Notwithstanding the Verdict.

## DISCUSSION

I. Introduction

█ A public employer clearly cannot condition public employment on a basis that infringes upon the employee's constitution-

ally protected interest in free speech. *Keyishian v. Board of Regents*, 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967) ("[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected."); *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315, *reh'g denied*, 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987) ("Even if [an employee] could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression."); *Page v. DeLaune*, 837 F.2d 233, 237 (5th Cir.1988) ("A state may not discharge an employee for exercising his right to free speech on matters of public concern."). Supreme Court jurisprudence, as well as our own, has, however, recognized that government employees are not always as free to speak as private citizens. *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Price v. Brittain*, 874 F.2d 252, 257 (5th Cir.1989). *Pickering* instructs us to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734.

The Supreme Court subsequently refined the *Pickering* analysis in *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). In *Connick*, the Court stated that an employee's speech is only entitled to judicial protection if it addresses a matter of "public concern." *See also Brawner v. City of Richardson*, 855 F.2d 187, 191 (5th Cir.1988). If the speech does not address a matter of public concern, then it is unnecessary to scrutinize the reasons for the discharge. *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690; *Noyola v. Texas Dept. of Human Resources*, 846 F.2d 1021, 1024 (5th Cir.1988).

■ Accordingly, a court considering a public employee speech case must first address whether an employee's speech concerns a matter of public concern. Only after the speech passes this threshold test should a court engage in the *Pickering* balancing analysis. If the speech survives the *Connick–Pickering* analysis, the employee bears the burden of proving that his speech was a motivating factor in his dismissal. If the employee satisfies this burden, the burden shifts to the employer to prove by a preponderance of the evidence that the employer would have discharged the employee even in the absence of the speech. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977); *Bowen v. Watkins*, 669 F.2d 979, 987 (5th Cir.1982).

After applying the *Connick* public concern analysis, the district court found that Kinsey's speech was primarily of a private concern and therefore not entitled to First Amendment protection. In addition, the district court found that even if the speech did address a public concern, under the *Pickering* balancing test the speech was not entitled to First Amendment protection because the employer's interests outweighed Kinsey's interest in free speech.

## II. Standard of Review

■ The inquiry into the protected status of speech is one of law, not fact. *Connick*, 461 U.S. at 150 n. 10, 103 S.Ct. at 1691–92 n. 108; *Brown v. Bullard Indep. School Dist.*, 640 F.2d 651, 653 (5th Cir.), *cert. denied*, 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981). Consequently we are entitled to review *de novo* the district court's determination that Kinsey's speech is not entitled to constitutional protection. *Kirkland v. Northside Indep. School Dist.*, 890 F.2d 794, 798 (5th Cir.1989). This court has a constitutional obligation to assure that the record supports the district court's conclusion. Therefore, "we are compelled to examine for ourselves the statements in issue and the circumstances under which they [were] made to see whether or not they … are of a character which the principles of the First Amendment, as adopted by the Due Process

Clause of the Fourteenth Amendment, protect." [1]

## III. Public Concern

 Whether an employee's speech addresses a matter of public concern must be determined by the "content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690 (footnote omitted); *Moore v. City of Kilgore*, 877 F.2d 364, 369 (5th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989); *Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360, 1362 n. 2 (5th Cir. 1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). "The courts will not interfere with personnel decisions 'when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest.' " *Page*, 837 F.2d at 237 (quoting *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690). In other words, when speech is purely private, such as a dispute over an employee's job performance, the employee enjoys no First Amendment protection of that speech. *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690; *Day v. South Park Ind. School Dist.*, 768 F.2d 696, 700 (5th Cir.1985), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986).

The required inquiry into the "content, form and context" of a given statement necessitates a case-by-case analysis. Consequently, courts have consistently avoided precisely defining the concept of "public concern." [2] Courts have used various criteria in their attempt to grasp this slippery concept. In *Connick*, the Court attempted to define "public concern" as "any matter of political, social, or other concern to the community." *Id.* at 146, 103 S.Ct. at 1690. Perhaps the only reasoned approach to this analysis is to determine what factors this court has used in the past to determine whether speech addresses a matter of public concern. [3] In *Davis v. West Community*

1. *Rankin*, 483 U.S. at 386, 107 S.Ct. at 2897 (quoting *Connick*, 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10) Therefore this court cannot "avoid making an independent constitutional judgment on the facts of the case." *Connick*, 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10 (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 190, 84 S.Ct. 1676, 1679, 12 L.Ed.2d 793 (1964)).

2. *Thompson v. City of Starkville*, 901 F.2d 456, 461 (5th Cir.1990) ("[T]he definition of the term 'public concern' is far from clear-cut.")

3. Another method courts have used in attempting to bring order to this analysis is to categorize the decided cases to determine what has and has not been held to be a matter of public concern. For example, protesting the President's policies by commenting favorably upon an assassination attempt against his life is a matter of public concern meriting protection. *Rankin*, 483 U.S. at 386–87, 107 S.Ct. at 2897–98. Similarly, a public school teacher may publicly protest the school board's allocation of resources between athletics and academics. *Pickering*, 391 U.S. at 571, 88 S.Ct. at 1736, or may privately protest a school's alleged racially discriminatory policy in a conversation with the principal, without fear of retaliatory dismissal, *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979).

The Fifth Circuit has held that public employees raise matters of "public concern" if they criticize a court's treatment of traffic appeals, *Scott v. Flowers*, 910 F.2d 201 (5th Cir.1990), or the conduct of police officers, *Thompson v. City of Starkville*, 901 F.2d 456 (5th Cir.1990). In addition, allegations regarding inadequate manpower at the local fire department are a matter of public concern, *Moore v. City of Kilgore*, 877 F.2d 364 (5th Cir.), *cert. denied,* — U.S. —— 110 S.Ct. 562, 107 L.Ed.2d 557 (1989), as are allegations regarding preferential grading of athletes and grades given in exchange for sexual favors, *Coats v. Pierre*, 890 F.2d 728 (5th Cir. 1989). Moreover, a state mental health facility social worker's statements to patients regarding their right to legal counsel are a matter of public concern, *Price v. Brittain*, 874 F.2d 252 (5th Cir.1989), as are comments criticizing the quality of nursing care given to a group of people, including inmates, *Frazier v. King*, 873 F.2d 820, 825 (5th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 502, 107 L.Ed.2d 504 (1989).

In contrast, public employees raise matters of "private concern" if they criticize the morale problems or transfer policies at the district attorney's office. *Connick*, 461 U.S. at 148–49, 103 S.Ct. at 1690–91. A teacher's failure to use proper administrative channels to approve a supplemental reading list also raises matters of private concern. *Kirkland v. Northside Indep. School Dist.*, 890 F.2d 794 (5th Cir.1989). In addition, grievances filed by employees alleging favoritism or criticizing the performance of co-employees and supervisors raise matters of a private concern. *Moore v. Mississippi Valley State Univ.*, 871 F.2d 545 (5th Cir.1989); *Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360

*Hosp.*, this court considered whether the communication in question related to the policies of the institution or to the actions of other employees and whether the communication was in-house when determining whether the communication involved a "public concern." 755 F.2d 455, 461 (5th Cir.1985). The following year, this court considered such factors as whether the employee tried to communicate to the public and whether people outside the workplace were debating the subject of the speech. *Gomez v. Texas Dept. of Mental Health*, 794 F.2d 1018, 1021–22 (5th Cir.1986).

■ In this case, Kinsey was stating his opinions about a political election which concerned the citizens of Salado. In addition, this speech was addressed to people outside the workplace. Although his position as superintendent was arguably at stake in the election, his speech did not solely relate to an employee grievance or school policy. Rather, his speech addressed a publicly debated issue regarding school board elections. Kinsey attempted to communicate his ideas on this subject through private and public discussions with the citizens of Salado, as well as through a letter published in a local newspaper.

These statements occurred in the context of a hotly contested public election. The community of Salado is a small, unincorporated city with a small school system. As we noted in *Burris v. Willis Indep. School Dist., Inc.*, 713 F.2d 1087, 1095 (5th Cir. 1983), "In such small communities, issues affecting local school matters can easily become issues of great public importance."

(5th Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). Moreover, an employee's protestations regarding an employer's unfavorable job evaluation raise a matter of private concern. *Day v. South Park Ind. School Dist.*, 768 F.2d 696 (5th Cir.1985), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986).

After engaging in this type of analysis, courts try to determine whether their facts are more analogous to the cases where the speech was held to address a public concern or a private concern. Although it is somewhat helpful to see how courts have generally handled various factually distinct situations, these cases are not factually similar enough to indicate whether Kinsey's speech addressed public or private concerns.

The record indicates that Kinsey, himself, had apparently become an issue in the election. A vote for the Berry Slate was essentially viewed as a vote for Kinsey. Kinsey and the Berry Slate supported leaving the daily operation of the school to the school administrators while those opposing the Berry Slate favored a more active role for the Board in the daily running of the schools. If Kinsey was indeed an issue in the campaign, his statements concerning the election were certainly of public interest. Kinsey's statements, made in the context of a public election, are the type of political speech which has been referred to as "the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).

The School District argues that an inquiry into Kinsey's motive is central to a determination whether his speech addressed a "public concern." The district court apparently adopted this reasoning, finding that Kinsey's speech during the Board elections was purely motivated by his concern for his job. Record at 703. Kinsey himself admitted that his concern for his job partly motivated his involvement in the election process. However, by focusing solely on an employee's motivation, a court does not fully analyze the content, form, and context of the speech, as the Supreme Court required in *Connick*.[4] In *Connick*, the Supreme Court recognized that an element of personal interest does not immediately remove the speech from the realm of "public concern."[5]

4. *See Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir.1988) (focusing solely on employee's motive "is undoubtedly a material concern."); *Rode v. Dellarciprete*, 845 F.2d 1195, 1201–02 (3d Cir.1988) (inappropriate for court to focus on motive "when a public employee participates in an interview sought by a news reporter on a matter of public concern. The employee is engaged in the exercise of a first amendment right to freedom of speech, even though the employee may have a personal stake in the substance of the interview.")

5. In *Connick*, the Court held that an employee questionnaire, distributed internally by an aggrieved employee, which primarily addressed internal matters of a personal concern, such as

This court has expressly recognized that an employee's speech may contain a mixture of public and personal concerns. For example, in *Gonzalez v. Benavides*, 774 F.2d 1295 (5th Cir.1985), *cert. denied*, 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986), this court observed:

> Gonzalez's disagreement with the commissioners indisputably was a matter of concern to Gonzalez as an employee. We do not read *Connick*, however, to exclude the possibility that an issue of private concern to the employee may also be an issue of public concern. Indeed, the teacher dress code in *Mount Healthy*, and the school bonds under discussion in *Pickering*, appear to have been "mixed" issues of both public and private concern.... We are persuaded that Gonzalez raised such a mixed issue.

*Id.* at 1300–01. *See also Thompson v. City of Starkville*, 901 F.2d 456, 465 (5th Cir. 1990) ("The existence of an element of personal interest on the part of an employee in his speech does not, however, dictate a finding that the employee's speech does not communicate on a matter of public concern."); *Brawner*, 855 F.2d at 192 ("[It] is clear that only a portion of a communication need address a matter of public concern.")

In sum, our perusal of the entire record leads us to believe that although Kinsey undoubtedly had a personal interest in the outcome of the school board election, his motive is not the controlling issue. Kinsey's statements made in the context of a hotly contested political campaign, supporting one slate of candidates, were primarily made as a citizen addressing a matter of public concern, not as an employee addressing purely private issues. Therefore, the district court incorrectly held that Kinsey's speech addressed matters of purely private concern.

## IV. Pickering Balancing

Having determined that Kinsey's speech passed the threshold question of "public concern," we must now apply the *Pickering* balancing analysis. The *Pickering* balancing analysis requires us to weigh Kinsey's interest in discussing matters of public concern, together with the public's interest in hearing such discussion, against the state's interest as employer in efficiently providing public services. *Pickering*, 391 U.S. at 568, 571–72, 88 S.Ct. at 1734.

Although the *Pickering* Court recognized that no general standard exists for measuring employee conduct, the Supreme Court did attempt to adumbrate some general lines of analysis in these types of cases. *Pickering*, 391 U.S. at 568–73, 88 S.Ct. at 1734–37. *Pickering* and its progeny have listed several specific examples of legitimate employer concerns: discipline and harmony in the workplace, confidentiality, freedom to discharge an employee whose speech has impeded the proper performance of her duties or whose speech is so lacking in foundation as to call his competence into question, protection of close working relationships that require loyalty and confidence, the abstract or personal nature of the statements, and the time, place, and manner of the speech. *Id. See also Gonzalez*, 774 F.2d at 1300. Not all of these factors are relevant to any one situation.[6]

A relevant consideration to our analysis in this case is whether Kinsey's statements were critical of a person "with whom [he] would normally be in contact in the course of his daily work" such that the criticism might impede "discipline ... or harmony among co-workers." *Pickering*, 391 U.S. at 569–70, 88 S.Ct. at 1735. The record

---

office morale, an office transfer policy and employee confidence in supervisors, nevertheless fell within the rubric of matters of public concern because one question dealt with matters of a public concern. One question on the survey dealt with whether employees ever felt pressured to work in political campaigns. The Court held this was a public concern because "there is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service." *Connick*, 461 U.S. at 149, 103 S.Ct. at 1691.

**6.** We do not suggest that the factors enumerated in *Pickering* and its progeny are meant to be exclusive of all others. Each individual set of facts may suggest new avenues of analysis.

indicates that Kinsey refrained from personal criticism of the candidates he opposed. Rather, his statements during the election simply reflected his high regard for the Berry Slate. *Cf. McBee v. Jim Hogg County*, 730 F.2d 1009, 1017 (5th Cir.1984) ("[I]t is one thing to work with a subordinate who has expressed a reasoned preference for another superior and quite another to have forced on one's organization an individual who has blackguarded one's honesty and ability up and down the county.")

Another relevant consideration is whether Kinsey was in a confidential relationship to the School Board. The district court held that "Kinsey, as superintendent, was in a close confidential relationship to the board of trustees [such that if] the relationship between the two are [antagonistic], the Salado Independent School District's operation may be adversely affected." Record at 702. Unquestionably, a school superintendent and his school board stand in a close and confidential relationship. The school board employs the superintendent, who in turn acts as the educational leader and administrative manager of the school district. TEX.EDUC.CODE ANN. §§ 13.351, 23.26, 23.28 (Vernon 1987 and Supp.1990). Since the school board can only act by a majority vote of its membership at duly called meeting, it is totally dependent upon the superintendent to effectuate its policies and decisions.

Nevertheless, we must weigh the government's interest in the loyalty of the superintendent against the superintendent's speech rights. "That weighing is required because we do not decide that all speech by persons in such relationships is unprotected. Rather, the speech must be weighed against its impact upon the relationship and that relationship's role in the elected official's discharge of his duties." *Gonzalez*, 712 F.2d 142, 150 (5th Cir.1983), *aff'd*, 774 F.2d 1295 (5th Cir.1985), *cert. denied*, 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986).

The School Board fails to prove that Kinsey's speech had any deleterious effects on discipline, working relationships, Kinsey's performance, or the regular operations of the school district. Although the School Board argues that no actual disruption is required under *Connick*, they fail to note that *Connick* allows terminations based on merely a reasonable apprehension of disruption only when the employee's speech addresses a public concern in only "a most limited sense." *Connick*, 461 U.S. at 154, 103 S.Ct. at 1693–94. The *Connick* Court cautioned that a stronger showing may be necessary when the speech more directly implicates public concern.

In this case Kinsey's speech during the school board election was at the heart of First Amendment protection. As the Supreme Court has stated, absent exceptional circumstances, "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). Involvement in the political process is central to the meaning of the First Amendment. As the *Connick* Court emphasized, the First Amendment "was fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689.

Although the position of superintendent requires a close working relationship with the school board, in this case the School Board failed to prove that Kinsey's public statements adversely affected his working relationship with the School Board. Undoubtedly the relationship between Kinsey and the School Board deteriorated to the point that the School Board felt it was necessary to relieve Kinsey of his position, but the record does not reflect, nor does the School District apparently assert, that this deterioration was caused by Kinsey's speech during the election.[7] Nor did Kinsey's participation in the school board election amount to public disavowal of the school board's authority over him. After

---

7. The School District repeatedly asserts that the Board's relationship with Kinsey deteriorated due to Kinsey's actions prior to the election, not due to his conduct during the election.

the election, Kinsey publicly promised to support the Board. Although several members of the new majority of the Board claimed Kinsey failed to comply with the spirit of the directives drafted by the Board following the election, the record is devoid of specific examples.

In this case, Kinsey's constitutional right to free speech clearly outweighs the School Board's interest in having a superintendent subject to a concept of loyalty which requires that he be forbidden to express his views on critical issues involving the schools. Voting and the right to speak freely on the issues debated in an election are entwined and symbiotically related. We cannot have an educated electorate if that electorate is deprived of the voice of those most intimately acquainted with the issues. A school superintendent possesses unique experience, judgment and knowledge regarding the operation of a school district. To unequivocally forbid such a person from participating in the election of school board members deprives that person his right to freedom of speech, and denies the electorate of access to his unique point of view.[8] Freedom of speech and the voting franchise are precious rights and we should deny them to few, if any.[9]

## V. Excessive Damages?

■ The School Board argues that the $250,000 the jury awarded Kinsey as damages for his "suffered mental anguish or emotional distress, loss of reputation, personal expenses, and other monetary harms" is excessive. The School Board argues that we should uphold the Judgment Notwithstanding the Verdict on this ground, or alternatively hold that the district court abused its discretion in conditionally denying a new trial because the verdict was contrary to the clear weight of the evidence.[10]

In evaluating whether the jury's award is excessive, we are mindful that assessment of damages is for the trier of fact, and "in this area the appellate court should step lightly or not at all." *In re Air Crash Disaster Near New Orleans*, 767 F.2d 1151, 1155 (5th Cir.1985). It is well settled that a jury's damages award should not be disturbed

> except on the "the strongest of showings." The jury's award is not to be disturbed unless it is entirely disproportionate to the injury sustained. We have expressed the extent of distortion that warrants intervention by requiring such awards to be so large as to "shock the judicial conscience," "so gross or inordinately large as to be contrary to right reason," so exaggerated as to indicate "bias, passion, prejudice, corruption, or other improper motive," or as "clearly exceed[ing] that amount that *any* reasonable man could feel the claimant is entitled to." (Footnotes omitted.)

*Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir.1983); *see also*

---

**8.** *Cf. Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (College professor speaking before Texas legislature in favor of a proposal to elevate all junior colleges to four-year institutions was a member of the public who, by virtue of his position, was likely to have special insight into matter of public concern.)

**9.** The School District argues a finding for Kinsey essentially assures a public employee of perpetual tenure by providing him the opportunity to challenge every employment decision on the basis of his speech or political activity. This argument overlooks the *Mt. Healthy* but-for analysis. *Mt. Healthy* requires the fact-finder to determine whether the employer would have suspended or fired the employee regardless of the protected speech. According to the Supreme Court, this inquiry is essential because the courts should not place an employee in a

better position as a result of his protected speech than he would have otherwise occupied. *Mt. Healthy*, 429 U.S. at 285–86, 97 S.Ct. at 575. This precise factual issue was submitted to the jury in the instant case and the jury found for Kinsey.

**10.** The School Board also argues that we should sustain the Judgment Notwithstanding the Verdict because Kinsey's speech was not a substantial motivating factor in the school district's decision to relieve him, and/or the School District would have decided to suspend Kinsey even in the absence of his speech. *See Mt. Healthy*, 429 U.S. at 285–86, 97 S.Ct. at 575. These issues are questions of fact. When faced with conflicting credible evidence, it was within the jury's province to resolve the conflict in favor of Kinsey. *See Brown v. Bullard Indep. School Dist.*, 640 F.2d 651 (5th Cir.1981).

*Marks v. Pan American World Airways, Inc.,* 785 F.2d 539, 540–41 (5th Cir.1986).

We are especially hesitant to disturb an award where, as here, the trial judge has upheld the verdict. *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 935 (5th Cir. 1982). In the case at bar, the district court specifically held that if it was reversed on its legal conclusions, the verdict of the jury should stand. Record at 701. "The jury's assessment of damages is even more weighted against appellate reconsideration, especially when.... the trial judge has approved it." *Caldarera,* 705 F.2d at 783–84; *see also Haley v. Pan American World Airways, Inc.,* 746 F.2d 311, 317 (5th Cir. 1984); *Shows,* 671 F.2d at 934.

■ Damages for violations of constitutional rights are determined in accordance with principles derived from the common law of torts. *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 305, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986). Damages in tort cases are designed to provide *"compensation* for the injury caused to plaintiff by defendant's breach of duty." *Carey v. Piphus,* 435 U.S. 247, 255, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978). Compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as "impairment of reputation ..., personal humiliation, and mental anguish and suffering." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974).

■ Compensatory damages may not be presumed, but must be proven. *Carey,* 435 U.S. at 263–64, 98 S.Ct. at 1052–53. Kinsey testified at trial as to the anguish, embarrassment, anxiety, and loss of reputation he has suffered, and the jury believed him. A plaintiff's testimony alone has been held to be sufficient proof of such damages. *See Chalmers v. City of Los Angeles,* 762 F.2d 753 (9th Cir.1985).

We have been cited to no case, nor have we discovered any case, which sheds any light on how high an award must be to be excessive. Courts have frequently upheld verdicts well in excess of this verdict for pain and suffering, both mental and physical. *See Shows,* 671 F.2d at 934. In this case, ample proof was presented at trial of actual injury to Kinsey, both in his effective discharge and by the damage done to his reputation and to his professional career as a superintendent. Therefore, the award of damages is affirmed.

## CONCLUSION

Kinsey's public and private conversations with the residents of Salado during the 1988 school board elections addressed matters of public concern. Kinsey undoubtedly had a personal interest in the outcome of the school board election. However, in the context of a hotly contested political campaign, these statements were made primarily as a citizen addressing a matter of public concern and not as an employee addressing purely private issues. In addition, in this case Kinsey's right to free speech outweighs the School Board's interest as an employer in efficiently providing public services. Finally, the damages awarded by the jury to Kinsey were not so inordinately large as to shock the judicial conscience. We have carefully considered the School District's other points of error and we find them without merit. Therefore, we REVERSE.

GEE, Circuit Judge, dissenting:

Today the Court holds that the highest executive in a public school system can, by deliberately injecting himself into and making his policy views a central issue in a school board election, so entrench himself in office that he cannot be discharged even though the voters rejected both the views that he espoused and his surrogates, the candidates whom he sought to elect.[1] Thus, although the school district constituency could vote out Dr. Kinsey's supporters who championed his policies, it could not rid itself of Dr. Kinsey who, like the

---

1. As the majority notes, "A vote for the Berry Slate was essentially viewed as a vote for Kinsey. Kinsey and the Berry Slate supported leaving the daily operation of the school to the school administrators...." (at 278). Of these latter, of course, Kinsey was the chief.

celebrated Vicar of Bray,[2] by an easy change of views is to maintain his position despite—indeed, precisely because of—his political meddling. Such a message, that self-conferred tenure waits only upon involving oneself in the political campaigns of one's elected superiors, will not likely be lost on policymaking public servants or those engaged in close working relationships with their public employers.

No lengthy writing is called for in dissent, it seems to me, for I do not think that this can be the law; to state the proposition is to refute it. If public servants such as Dr. Kinsey, whom the majority concedes "unquestionably" stands in a close and confidential relationship to the school board (at 280), have only to enter the fray on one side or the other of board elections in order to lock down their positions for good and all then, and just insofar, the Constitution truly has become a suicide pact. Long ago, in reliance on Supreme Court authority, we held the contrary:

> In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court found that the First Amendment protected employees from discharge because of their political affiliation but excluded from this protection holders of certain "policy-level" positions. While the *Branti* Court eschewed this categorical inquiry, it continued to acknowledge that political affiliation may be a sufficient proxy of necessary loyalty as to be permissibly considered for certain types of "positions."
>
> . . .
>
> *There is a governmental interest in securing those unique relationships between certain high level executives and the elected officials at whose grace they serve.* For this narrow band of relationships, refusing to grant First Amendment found tenure would seem to take away little freedom not already lost in accepting the appointment itself, at least

when the appointive job has the sweep of authority and discretion as to be central to the elected official's duty. The holder of such a position can hardly have any reasonable expectation but that his policy choices must publicly fall within the protective license issued by his appointing officer. His selection presumably included that supposition. To say that loss of that job is the price for his public declaration chills little. For us it follows that disruption of the relationship between an appointing authority and a holder of such a senior position may be weighed in the assaying of his First Amendment right to escape termination for a public disavowal of his appointing authority's power of supervision. But we say no more than that such governmental interests are relevant to the First Amendment inquiry into the context of time, place, and manner.

> In terms of this case the ultimate question is whether that interest was present here and was such that Gonzalez's First Amendment protection did not include job security as executive director of the Community Action Agency.

*Gonzalez v. Benavides,* 712 F.2d 142, 147–48 (5th Cir.1983) (emphasis added).

And again, the Court, sitting en banc, reiterated the principles governing today's case:

> On the one hand, the court should consider to what degree the deputies' participation in the election campaign or Mrs. McBee's actions involve "public concerns." On the other, the court should consider whether "close working relationships are essential to fulfilling [the deputies'] public responsibilities," *Connick,* 461 U.S. at 151–52, 103 S.Ct. at 1692, 75 L.Ed.2d at 723. We caution that the "closeness" of a working relationship as it affects job performance is not to be gauged merely by the size of the office or the number of employees. Rather, it

---

**2.** It will be recalled that the 16th century Vicar managed to retain his endowed living during all religious changes of the reigns of Henry VIII, Edward VI, Mary and Elizabeth I, a feat that gave rise to a popular ballad:

And this is the law I will maintain
Until my dying day, Sir,
That whatsoever king shall reign
I'll still be the Vicar of Bray, Sir.

is a function of the particular "public responsibility" being carried out. "Close working relationships" may be less relevant to the effectiveness of a five-man, one-room Motor Vehicle Bureau than they are to the effectiveness of a 50–officer police precinct, for example. Should the court find "close working relationships" "essential," it must then determine whether the particular speech sufficiently disrupted the working relationship as to prevent effective performance, requiring a stronger showing of disruption as the employees' speech moves closer to core "public concerns." *Id.*

Relevant to the determination of disruptive effect is the time, place and manner of the political activity. The *Connick* court, for example, noted that the employee in that case used work time and work space, commenting that employee speech that did not do so "might lead to a different conclusion." 461 U.S. at 153, n. 13, 103 S.Ct. at 1693, n. 13, 75 L.Ed.2d at 724, n. 13.

Finally, the court should consider whether, taken in context, the particular activity could be considered sufficiently hostile, abusive or insubordinate as to disrupt significantly the continued operation of the office. 461 U.S. at 153–54, 103 S.Ct. at 1693, 75 L.Ed.2d at 724. In this connection, to the extent that the district court's analysis suggests that as a matter of law it will never be relevant to First Amendment inquiry whether the speech involved constitutes personal as distinguished from party political support, it stands corrected by *Connick* and *Gonzalez. Cf. Gonzalez,* 712 F.2d at 148 (even where no intimate working relationship exists, an appointed senior official's public disavowal of the authority of his superiors may constitute such disruption as to outweigh his First Amendment right in that speech). *McBee v. Jim Hogg County, Tex.,* 730 F.2d 1009, 1016–17 (5th Cir.1984).

The record indicates, and indeed it is common knowledge, that a Texas school superintendent such as Dr. Kinsey is the principal executive of the school district, standing in like relationship to school board members as does the president of a business corporation to his board of directors. In addition, while molar policy is in great degree for the board, molecular policy is his. The relationship is all but symbiotic, and a ruder violation of it than public campaigning by the superintendent for one faction of the board against another can scarcely be imagined.

If the majority's eloquent opinion is correct, however, taking sides in the next election should be a new superintendent's first step if he likes his job: barring a truly incandescent ingratitude, if those for whom he campaigned prevail, his job is safe; and if they do not, their successful opponents, whose election he opposed, cannot discharge him. With all deference to my Brethren, I cannot believe that such is the law. I therefore respectfully dissent.