NO. 07-07-0035-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

JANUARY 23, 2008

_____

H. SCOTT NORVILLE, PAMELA EIBECK, ELIZABETH HALL, APPELLANTS

V.

R. SCOTT PHELAN, APPELLEE

_____

FROM THE 237TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2005-532,489; HONORABLE SAM MEDINA, JUDGE

_____

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

Appellants, H. Scott Norville, Pamela Eibeck, and Elizabeth Hall, appeal from an order denying summary judgment in their favor. By a single issue, Appellants contend the

trial court erred by failing to grant their motion for summary judgment as to all claims[1] because the evidence conclusively established that they were entitled to the protections of official immunity. Believing Appellants have established that they are entitled to official immunity as to some claims, but not all claims, we affirm in part and reverse and render in part.

## Factual and Procedural Background

In October 1998, Dr. James McDonald, the Chair of the Department of Civil and Environmental Engineering at Texas Tech University, offered Appellee, R. Scott Phelan, a Research Assistant Professor position. Phelan accepted the position and started work in December 1998.

Under the Texas Tech Regents' Rules, appointments are either continuing appointments, probationary appointments that may lead to the admission to tenure, or special full-time appointments which do not lead to tenure. Phelan's position was designated as a special full-time appointment. As such, he could not acquire tenure if he remained in that position. However, if he served six years as a Research Assistant Professor, Phelan would be entitled to be dismissed only for cause and he would be entitled to due process procedures conforming with the faculty grievance procedure.

---

[1]Norville does not appeal the trial court's denial of summary judgment in his favor on Phelan's assault claim.

In 2001, Phelan accepted a new position as an Assistant Professor for the academic year running from September 1, 2001 through May 31, 2002. Although his appointment was probationary, this position could lead to admission to tenure.[2] Under the Regents' Rules, all faculty members must complete a probationary period before acquiring tenure. Before the end of the sixth year of the probationary period, an untenured Assistant Professor must be notified in writing either that tenure has been awarded or that the appointment will not be renewed at the end of the seventh year. Computation of the six year probationary period commences upon a faculty member's initial appointment to a tenure-eligible rank such as Assistant Professor. Thus, if Phelan continued to serve as a tenure-eligible Assistant Professor, he would be entitled to notification whether he was tenured by the Fall of 2007.

In September 2003, Dr. H. Scott Norville was appointed Interim Chair of the Department of Civil and Environmental Engineering at Texas Tech University. In July 2004, Norville was promoted to Chair of that Department. In each capacity, Norville supervised and evaluated all faculty members within that Department.

---

[2]Under Texas Tech's Operating Policies and Procedures and Regents' Rules, the general criteria for tenure include an evaluation of a faculty member's abilities related to teaching, research/creative ability, and professional service. The tenure candidate is responsible for detailing his accomplishments in a dossier and obtaining the recommendation of the basic academic unit. Afterwards, there is a detailed procedure of review starting with the College or School, then by the Provost/Senior Vice President of Academic Affairs, next by the President, and finally the Board of Regents.

Norville first evaluated Phelan's performance in his Annual Faculty Evaluation dated February 24, 2004. At that time, Norville indicated that, although Phelan had a lighter than average teaching load, he had a moderately large amount of externally funded research. Norville further noted Phelan was nearing the midpoint of his probationary period with no journal publications. He stated if Phelan wished to achieve tenure and promotion, he needed to produce journal publications. He also observed Phelan had a lack of focus and advised him to submit research proposals to funding organizations other than the Texas Department of Transportation (TxDOT).

In May 2004, Pamela Eibeck became Dean of the College of Engineering. Shortly thereafter, she met with all her faculty members to learn more about their backgrounds and research expertise. During her meeting with Phelan, she became concerned that his resume reflected few peer-reviewed journal publications. She shared this concern with Norville.

During Fall 2004, Norville appointed a committee of tenured faculty to perform a "mid-tenure review" of Phelan's performance. In November 2004, Phelan received the committee's evaluation. The evaluation complimented Phelan on his preparation of a detailed record of his accomplishments, noted that he was regarded as an asset to the Department, and acknowledged that his expertise in bridge engineering brought depth to the structure group. Phelan also received high student evaluations for teaching and he was recognized for obtaining a substantial amount of research funding. Although he had

4

devoted a lot of attention to writing reports related to his research grants, the Committee observed he had given little attention to transforming his research into archival journal publications.[3] The Committee commended Phelan for his recent efforts in this regard but noted this had been a consistent comment in his last three annual reviews and should now receive the highest priority.

Phelan met with Norville regarding his mid-tenure review. Norville also indicated Phelan needed to make more journal publications and he eased Phelan's teaching load so he could complete his research reports for TxDOT. Norville indicated if Phelan did not complete his overdue TxDOT reports, he would be asked to leave.

In March 2005, Phelan received his second Annual Faculty Evaluation from Norville. Although Phelan's teaching evaluations had risen considerably, he had no continuing research projects and no new research projects. Phelan continued to work on finishing three TxDOT reports from past projects and was awaiting approval on a fourth report submitted in 2005. The evaluation noted Phelan was the first author on a paper accepted by a journal and had several more papers under submission. Phelan was urged to reduce his service commitment in deference to focusing on activities that would aid him in

---

[3]In deposition, Phelan's counsel asked Provost William Marcy to comment on Phelan's mid-tenure review. Marcy indicated that, if he were presented with the review for a tenure determination, he would not approve it. He found Phelan's mid-tenure review to be deficient because Phelan was "first author" on only one of the three peer-reviewed journal publications. Marcy indicated Phelan needed to be the first author on at least five or six. He commented Phelan's problems with journal publications would be a "showstopper" for tenure.

achieving tenure and promotion. The evaluation emphasized that a successful faculty member must not only teach well but should also pursue external funding, mentor graduate students, advise undergraduate students, perform routine departmental duties, and publish in archival journals in order to achieve tenure and academic advancement.

On March 10, 2005, Phelan met with Norville to discuss the evaluation. Norville expressed his displeasure at Phelan's continued lack of publications, his failure to complete outstanding TxDOT reports, his absence from the office except when teaching class, and his failure to submit proposals for funded research. He praised Phelan on the dramatic improvement in his course evaluation scores during 2004 and his service commitment. However, he advised Phelan that his service commitment was too high and did not constitute the best use of his time in attempting to achieve tenure. Norville requested Phelan to sign a copy of his evaluation to indicate that he received a copy of it. Phelan refused to sign the evaluation because he believed it contained misleading statements.

On March 11, 2005, Phelan initiated an exchange of e-mails lasting several days. Phelan sought a second meeting with Norville to discuss the relationship generally between publications and tenure. At that time, Phelan noted that he had submitted his application to another university and was on their short list. Phelan also indicated that he had concluded from their meeting that it was not going to be possible for him to remain at Texas Tech. In a subsequent e-mail, Phelan described his evaluation as inaccurate,

6

attached a four-page rebuttal letter proposing numerous changes, and requested the letter be placed in his file. He took issue with Norville's statement that Phelan had basically ceased conducting funded research and requested a counter statement to the effect that, in 2004, Norville had strongly urged Phelan to "get rid" of his TxDOT research.

Norville next discussed Phelan's attitude and performance with Dr. Heyward Ramsey, Civil Engineering Associate Department Chair. It was determined that Drs. Ramsey and Ken Rainwater should meet with Phelan. At a regularly scheduled meeting, Eibeck mentioned to Norville that Phelan had made several accusations against Norville including an assault that was alleged to have occurred in the Fall of 2004. She suggested Norville not meet with Phelan unless a witness was present.

On March 29, 2005, Phelan met with Norville a second time to discuss a revised draft of his 2004 Annual Faculty Evaluation. Norville's administrative assistant also attended the meeting. Little progress was made toward any agreement on a final draft. During the meeting, Phelan indicated that the number of reports he owed to TxDOT had increased. After the meeting, Phelan received an e-mail from Ramsey requesting a meeting to discuss whether Phelan was going to remain at Texas Tech. Phelan, Ramsey, and Rainwater met, at which time Phelan told them about the alleged assault.

In April 2005, Norville met with Drs. Ramsey, Rainwater, and Jayawickrama. They discussed Phelan's failure to complete TxDOT reports, his lack of publications, and his

work attitude. The consensus at the meeting was Phelan should seek other employment because of his lack of satisfactory progress toward tenure.

Norville informed Eibeck that he wanted to consider non-reappointment because Phelan was an unlikely candidate for tenure. In late April, Eibeck concurred with Norville's recommendation and informed the Provost's Office that she and Norville might recommend Phelan not be reappointed. Norville contacted Victor Mellinger, Senior Associate General Counsel for Texas Tech, to ask him about the process of issuing a notice of non-reappointment. Mellinger referred Norville to Vice Provost Elizabeth Hall.[4]

In early May 2005, Norville contacted Hall to discuss his latitude as a department chair to dismiss Phelan. Norville described Phelan as a faculty member who was not making adequate progress toward tenure and was not being responsive to the stipulations of a major granting agency. Hall agreed there was a legitimate basis for Phelan's non-reappointment and that the non-reappointment would be supported by Texas Tech policies. The Provost's Office concurred with Phelan's non-reappointment, and advised Norville to offer Phelan the opportunity to resign or be non-reappointed.

---

[4]Hall's duties consisted of providing assistance for academic units with regard to faculty hiring, budget information, and representation of the Provost to various councils and committees. She was an *ex-officio* member of the Tenure Advisory Committee, and advised faculty on tenure issues. Although Hall has subsequently married and changed her last name to Burns, we refer to her as Hall throughout this opinion.

Norville later scheduled a lunch with Phelan and on May 9, 2005, Norville, Ramsey, and Phelan met at a local restaurant. During lunch, Norville offered Phelan the opportunity to either resign or be non-reappointed. Following the lunch, Phelan understood his two options were to resign or be fired.

On May 11, 2005, Phelan sent Norville an e-mail initiating a series of communications. Phelan requested clarification on Norville's ability to non-reappoint him, accused Norville of violating the Faculty Handbook, violating his duty of public trust, furnishing false information to Texas Tech, physical abuse, and indecent conduct by telling crude and offensive jokes, and by using demeaning language. Phelan also complained Norville should have delivered his ultimatum in the privacy of an office rather than a public restaurant. Norville denied each accusation and indicated Phelan's style was offensive. Norville indicated if Phelan could find faculty support for any of his accusations, he should proceed. Norville also indicated that the May 9, 2005, meeting was held in a public place because he believed it would encourage restraint on everyone's part.

Phelan responded that Norville's ultimatum was insulting, retaliatory, vindictive, and illegal. He accused Norville of terminating him because he disagreed with Norville's 2004 assessment of his performance. Norville replied he was not acting alone and had previously conferred with the Dean and Provost's Office. Phelan responded by threatening to sue Norville because his actions were beyond the scope of his duties at Texas Tech and an abuse of power. He further stated Norville would be receiving a subpoena for his

9

records, suggested Norville discuss the matter with his attorney, seek advice regarding "the consequences of spoliation of evidence" and how the consequences would apply to other faculty members, staff, and his consulting partners and employees. Phelan also sent an e-mail informing many of the civil engineering faculty, several staff members, and persons outside of the Department that he intended to sue Norville.

On May 14, 2005, Senior Associate Dean Ernest Kiesling met with Phelan. Kiesling admitted Norville had an abrasive style but wanted to know if there was any way Phelan would arbitrate his complaints related to Norville and reset the tenure process. Meanwhile, Eibeck asked Norville to draft a statement recommending Phelan's non-reappointment. During the drafting process, Eibeck provided comments to Norville by e-mail[5] as follows:

> I read your statement. My suggestion is that you change the Introduction to be more of an Executive Summary that gives a succinct set of reasons to let Phelan go. Too much of the document sounds like "I couldn't get along with the creep so I am firing him." Make it clear that 1. He is minimally performing on the job with examples and then 2. His actions reflect dysfunctional behavior with examples. Emphasize the most significant issues to the institution first vs. The ones that bother you most. For example, the fact that he would come to see me without first notifying you is trivial to a Provost.

On May 19, 2005, Phelan went to the District Attorney's Office in Lubbock to report an alleged assault on his person by Norville in the Fall of 2004. The DA's office informed Phelan he would have to report the incident to the Lubbock Police Department who then

---

[5]In her affidavit, Eibeck indicated that the e-mail was intended to have Norville modify his statement to focus more on Phelan's performance and less on Phelan's behavior.

referred Phelan to the Texas Tech Police. Phelan then filed an assault complaint against Norville with the Texas Tech Police.

On May 20, 2005, Marcy, Hall, Mellinger, Eibeck, Kiesling, and Norville met to discuss the proper procedure for issuing Phelan's notice of non-reappointment. During that meeting, a Texas Tech Police Officer brought them a copy of Phelan's assault complaint against Norville. Other than reviewing the contents of the complaint, the report was not discussed at the meeting. On May 26, 2005, Texas Tech Police informed Norville they had completed their investigation of Phelan's assault complaint and would not pursue any charges.

Eibeck and Norville subsequently delivered a letter dated May 26, 2005, to Phelan informing him of his non-reappointment as a tenure-acquiring faculty member, and offered him a terminal appointment for the '05-'06 academic year. Per the letter, Phelan's last day of employment would be May 31, 2006.[6] The basis for Phelan's non-reappointment was his failure to submit timely reports to his primary research sponsor, TxDOT, his lack of journal publications, and his inability to carry out simultaneously varied tasks required of a tenure track faculty member.

---

[6]Marcy and Eibeck also executed a Personnel Action Form (PAF) effective May 31, 2005, indicating Phelan was to continue in his previous appointment as an Assistant Professor until May 31, and then serve full-time as a Research Assistant Professor until June 30. His new appointment would be a terminal appointment as an Assistant Professor from September 1, 2005 until May 31, 2006. The PAF was delivered to Phelan with Eibeck's letter.

Per the Regents' Rules and Faculty Handbook and Operating Procedures, Phelan was not eligible for tenure at the time of his non-reappointment in May 2005. He had not completed the probationary period of six years, and the Board of Regents had not admitted him to tenure. Because Phelan had served only three years as a Research Assistant Professor and three years as an Assistant Professor on a tenure track, he had attained no particular employment status entitling him to continued employment under Texas Tech's policies and procedures.

Under the Regents' Rules, full-time untenured faculty members, such as Phelan, with more than two years employment are entitled to notice of non-reappointment by issuance of a terminal contract for one academic year. Texas Tech is not required to give a reason for a decision of non-reappointment. However, if the faculty member alleges that a decision not to reappoint was caused by considerations violative of academic freedom, for constitutionally impermissible reasons, or for significant noncompliance with Texas Tech's established standards or prescribed procedures, the allegations are given preliminary consideration by a Faculty Committee appointed by the Tenure Advisory Committee (TAC).[7] If the Faculty Committee concludes that an allegation is supported by probable cause, the Tenure Advisory Committee notifies the Provost and convenes a Hearing Committee where the matter is heard with procedures outlined in the Regents'

---

[7]Per the Regents' Rules, the members of the Faculty Committee can be appointed from within or outside the membership of the TAC. TAC consists of five tenured faculty members and two *ex-officio* members, the Provost, and a dean selected by the Provost's Council. Both TAC and the Faculty Committee determine their own rules of procedure.

12

Rules. If the Faculty Committee determines that probable cause does not exist, no further action is taken and the non-reappointment stands.

Phelan sought review of his non-reappointment before the TAC and submitted a memorandum to the Provost's Office. His memorandum contained a statement of facts, an analysis of his request for review, his request for relief, and *de facto* tenure presentation with a discussion of the Regents' Rules. His resume was also attached with various exhibits.

Phelan also filed a grievance against Norville with the President's Office dated May 31, 2005. The grievance contained a statement of facts discussing his grievance and requested relief.[8] Ron Phillips, a representative of the President's Office, told Phelan that he should first present his grievance against Norville to Eibeck.

---

[8]The faculty grievance procedure set forth in Texas Tech OP 32.05 and TAC's review of a non-reappointment set forth in Regents' Rule 04.02.8, are separate proceedings. OP 32.05 1.b. states "[i]f the grievance is related in any way to tenure decisions, the faculty member should refer to the Texas Tech University tenure policy," and "[g]rievances of faculty relating to admission of tenure, grounds for termination, termination procedure, and notice of non-reappointment or termination are not to be covered by the procedures noted below." Neither the grievance procedures nor Regents' Rules contain any prohibition against the sharing of information or documents between the Grievance Committee and TAC or their appointees in the event of simultaneous proceedings on related subject matter or under any circumstances. Moreover, the sole limitation on evidence presented in a grievance proceeding is the evidence "must relate to the grievance." OP 32.05 4.c. Regents' Rule 04.02.8 contains no limitation on evidence that may be submitted or reviewed by TAC.

As Vice Provost and *ex-officio* TAC member, Hall was responsible for scheduling a faculty committee meeting to review Phelan's non-reappointment. Hall was also responsible for providing TAC and the faculty committee with relevant information, including an initial briefing on Texas Tech policy governing their fact finding and deliberation. Prior to scheduling the meeting or briefing, Hall sent TAC's members a copy of Phelan's submission.[9]

On June 23, 2005, Eibeck met with Phelan, Phelan's father, and Kiesling to discuss Phelan's grievance. Following their meeting, Eibeck anticipated Phelan would file suit against Norville and Texas Tech. At Phillips's request, Eibeck drafted a response to Phelan's grievance. On June 29, 2005, Eibeck circulated her draft response to Norville, Phillips, Mellinger, and Hall. She requested they review her draft and comment whether she sufficiently and appropriately addressed the issues.

In his response to Eibeck's request, Norville offered to submit his resignation if Phelan would also tender his resignation and sign an agreement to suspend further legal action against Norville and Texas Tech. In response to Eibeck's refusal to accept a letter

---

[9]Phelan contends Hall purposely provided TAC with a blackened, blurred, unreadable copy of the Mid-tenure Review letter dated October 29, 2004, to obscure any favorable comments related to Phelan's performance. Appellants attached a copy of the letter reviewed by TAC as an exhibit to their motion for summary judgment.

14

of resignation, Norville commented that he was not really ready to step down and just "thought a little skullduggery might work."[10]

In the process of reviewing Eibeck's draft response to Phelan's grievance, Hall realized many of Phelan's allegations seeking TAC's review of his non-reappointment were also addressed in Eibeck's draft response to Phelan's grievance. She called Mellinger to determine whether Texas Tech policy precluded her from presenting Eibeck's response to TAC. Mellinger advised Hall if TAC wanted to review the document, there was no policy preventing them from doing so because the tenure policy calls for TAC to make their own rules on how information is gathered.

On June 29, 2005, TAC met to review Phelan's non-reappointment. The meeting was attended by Sue Couch, Fred Suppe, Steve Sears, Lynn Huffman, Ben Shacklette, and Hall.[11] Hall brought Eibeck's draft response, explained what the document was, and advised TAC the document contained both relevant and nonrelevant information. She asked whether they wanted to consider Eibeck's draft response or have the information gathered through interviews or written responses. She also advised it was within TAC's discretion to review Eibeck's draft response if they believed the document would assist them in rendering their decision. TAC chose to review Eibeck's draft response. After

---

[10]On deposition, Norville described "skullduggery" as "working behind the scenes."

[11]With the exception of Ed Steinhart, all members of the Committee were present. Shacklette left the meeting early and did not vote. TAC has no rules related to quorums.

meeting for approximately thirty-five minutes, TAC unanimously upheld Phelan's non-reappointment.

By letter dated August 12, 2005, Phelan submitted his resignation from Texas Tech. On August 17, 2005, using his Texas Tech e-mail account, Phelan sent an e-mail related to his resignation to faculty members and staff throughout the Department. Phelan's e-mail accused Norville of publicly shouting at him, calling Phelan a "slave," slamming a door in his face, slapping him twice without warning, and intentionally misrepresenting his performance to the Dean and other faculty. Phelan also announced he intended to sue Norville. Rainwater responded and assured everyone that Phelan's e-mail did not properly represent the complete story and indicated Phelan's e-mail bordered on slander. Phelan responded truth was a defense to slander and they should be aware they were not immune from slandering him.

Norville forwarded Phelan's e-mail to Mellinger and others to find out if Phelan's e-mail privileges at Texas Tech could be suspended and whether Norville should attempt to seek an injunction to stop such comments in the future. Marcy forwarded the e-mail to Sam Segran and asked him to determine the applicable Texas Tech procedures in such a case and whether Phelan had an alternative ISP provider where they could forward Phelan's e-mails. After some back and forth, Eibeck sent an e-mail to Segran, Mellinger, and Marcy stating:

While Scott Phelan has technically resigned, in reality, he was given a terminal contract (last day next May consistent with university policy) and he chose to resign in response. He has threatened lawsuits and has sent accusatory emails to all faculty and staff in the department. It is certainly possible that he would use his e-raider account to continue this hostile behavior as well as cause harm to the institution.

Hence, please disable Scott Phelan's e-raider account effective at the end of this Friday, August 19, his last day of employment.

We do not know his personal email address and given his hostile behavior, I don't want us to inform him in advance of this action for fear of damage that could be done between now and when the account is closed. My office will send a brief letter to his home address informing him that his emails will be transferred to his personal email account as soon as he informs someone in IT of the personal email account.

Segran responded Phelan's e-mail account would be disabled the next day per Eibeck's request. Segran indicated disabling the account was "a prudent move to protect university resources" and the "action [was] in line with other cases."

In the Fall of 2005, Norville received an e-mail from a third party expressing regret for what was occurring in the Department because of Phelan's lawsuit.[12] The third party asked why Phelan resigned, and on November 28, 2005, Norville responded as follows:

There were reasons beginning with the fact that after five (5) years, Dr. Phelan had no journal publications. When I tried to get him to publish, his response was nasty at best. Following that, I found out that Dr. Phelan was not even writing reports to his research sponsor, TxDOT, and, hence hurt

---

[12]The lawsuit being referenced was not this lawsuit. Phelan had filed a "whistleblower" suit against Texas Tech University on August 23, 2005.

TechMRT's chances of getting funded research. We can see what happens for the summer, but I repeat that the salary will not even pay your air fare alone.

In January of 2006, Phelan petitioned the district court for a pre-suit order to depose numerous Texas Tech employees in order to investigate potential claims. Thereafter, Phelan amended, and later supplemented, his petition to allege a myriad of claims against Appellants and Victor Mellinger, based upon various legal theories[13] relating to five general factual categories: (1) claims related to Phelan's assault allegations, (2) claims related to his non-reappointment, (3) claims related to his TAC appeal, (4) claims related to the termination of his e-mail account, and (5) claims related to Norville's November 28, 2005 e-mail. The parties filed competing motions for summary judgment. Without specifying any grounds, the trial court issued an order granting Mellinger's motion for summary judgment, denied Appellants' motion for summary judgment in part as to the assault claim asserted against Norville, and reserved ruling on Appellants' motion as to all other claims asserted. Thereafter, again without specifying any grounds, the trial court issued a second order denying the remainder of Appellants' motion for summary judgment. Appellants then brought this appeal contending the trial court erred in denying their motion for summary judgment on all claims asserted by Phelan (except the assault claim asserted against Norville only) because the evidence

---

[13]Phelan's theories of recovery included assault, libel and/or slander, invasion of privacy, conspiracy and/or aiding and abetting to tortiously interfere with his employment contract and/or future employment, and denial of due process and/or conspiracy to deny his due process rights.

conclusively demonstrated Appellants acted (1) within the scope of their generally-assigned duties, (2) in exercising discretion and independent judgment, and (3) in good faith, thereby entitling each Appellant to the protections of the official immunity defense.

## Standard of Review

We review the trial court's granting of a summary judgment *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). A review of the denial of a motion for summary judgment where there is an assertion of official immunity is governed by the same standard as governs review of the granting of such a motion. *Welch v. Milton*, 185 S.W.3d 586, 593 (Tex.App.–Dallas 2006, no pet.).

Because official immunity is an affirmative defense, to obtain summary judgment on official immunity, the governmental employee must conclusively prove each element of the defense. *Gray County v. Shouse,* 201 S.W.3d 784 (Tex.App.–Amarillo 2006, no pet.). A "matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence." *McCartney, M.D. v. May, M.D.,* 50 S.W.3d 599, 604 (Tex.App.–Amarillo 2001, no pet.). Once the defendant meets this initial burden, the plaintiff must submit or identify evidence in the record raising a genuine issue of material fact as to the defense. Tex. R. Civ. P. 166a. A fact is "material," if it might affect the outcome of the suit under governing law, and an issue is "genuine" if it is real and substantial, as opposed to merely formal, pretended, or a sham. *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001).

19

We take as true all evidence favorable to the nonmovant while indulging every reasonable inference and resolve any doubts in the nonmovant's favor. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). However, the nonmovant may not raise a genuine issue of material fact by submitting conclusory allegations, unsubstantiated assertions, improbable inferences, or unsupported speculation. *See See First Union Nat. Bank v. Richmont Capital Partners I, L.P.*, 168 S.W.3d 917, 930 (Tex.App.–Dallas 2005, no pet.).

## Official Immunity Defense

Common law official immunity is based on the necessity of public officials to act in the public interest with confidence and without the hesitation that could arise from having their judgment continually questioned by extended litigation. *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 424 (Tex. 2004). Unlike sovereign immunity, the doctrine of official immunity is not a bar to suit or a jurisdictional issue. *See McCartney, M.D.,* 50 S.W.3d at 603. Rather, the affirmative defense is a bar to liability and shields the party claiming official immunity from individual liability for the claims asserted in the suit. *Telthorster v. Tennell*, 92 S.W.3d 457, 460 (Tex. 2002).

To establish their right to summary judgment on official immunity, Appellants have the initial burden to conclusively prove that the actions which form the basis for Phelan's suit arise (1) from the performance of duties within the scope of their authority (2) that were discretionary and (3) exercised in good faith. *Gray County v. Shouse*, 201 S.W.3d 784, 786 (Tex.App.–Amarillo 2006, no pet.) *citing University of Houston v. Clark*, 38

20

S.W.3d 578, 580 (Tex. 2000). In determining whether an official's summary judgment evidence conclusively establishes the defense, we must determine whether there are disputed facts material to its elements. *Telhorster*, 92 S.W.3d at 460-61.

Once the official has established his entitlement to immunity as a matter of law, the burden shifts to the plaintiff to show that "*no* reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts." *McCartney, M.D.,* 50 S.W.3d at 605 (emphasis added) *quoting City of Lancaster v. Chambers*, 883 S.W.2d 650, 657 (Tex. 1994). It should be noted, however, that official immunity "may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated." *Ballantyne,* 144 S.W.3d at 427-28.

### 1. Scope of Official's Authority

Public officials act within the scope of their authority if they are discharging the duties generally assigned to them; *Ballantyne,* 144 S.W.3d at 425, and the fact an act that forms the basis of the suit was performed improperly or negligently does not take the act outside of the scope of authority. *Wethington v. Mann*, 172 S.W.3d 146, 152 (Tex.App.–Beaumont 2005, no pet.).

Phelan contends Appellants acted outside the scope of their authority because they engaged in acts Phelan alleged were wrongful. Phelan misconstrues this prong of the test for official immunity. So long as Appellants were "discharging duties generally assigned

21

to them," they were acting in an official capacity. *See Bagg v. University of Texas Medical Branch at Galveston*, 726 S.W.2d 582, 587 (Tex.App.–Houston [14th Dist.] 1987, writ ref'd n.r.e.). Phelan's reasoning was rejected by the Supreme Court in *City of Lancaster v. Chambers,* 883 S.W.2d 650 (Tex. 1994), where the Court made clear that the focus is not on whether the official had authority to perform an allegedly wrongful act, but on whether the official is performing the duties generally assigned to him when the act occurs. *Id.* at 658.

### A. Norville

Norville's duties included evaluating Phelan's performance and tenure prospects. As Phelan's primary supervisor, his authority also included making personnel recommendations such as non-reappointment and informing Phelan that he had the option of resigning or being terminated. Non-reappointment is an option department chairs can exercise before tenure, and department chairs and deans are responsible for hiring and retaining faculty. Norville was acting within the scope of his authority when he engaged in acts related to Phelan's evaluation and non-reappointment. Furthermore, Norville's involvement in Phelan's TAC appeal and grievance were administrative responsibilities within the scope of his authority.

There is, however, no summary judgment evidence tending to establish whether Norville was acting in an official capacity when he sent the e-mail dated November 28, 2005, to a non-university related third party stating, "Dr. Phelan had no journal

22

publications." Accordingly, we find that, with the exception of the e-mail dated November 28, 2005, competent summary judgment evidence established that Norville was acting within the scope of his authority when he engaged in acts complained of by Phelan.

### B. Eibeck

As Dean, Eibeck was responsible for the day-to-day operation of the College of Engineering including reviewing and approving personnel matters. Her duties included participating in Phelan's evaluation, non-reappointment, and TAC appeal. Furthermore, Eibeck was acting within the scope of her authority when she recommended that Phelan's Texas Tech e-mail account be disabled. Accordingly, we find that competent summary judgment evidence established that Eibeck was acting within the scope of her authority when she engaged in acts complained of by Phelan.

### C. Hall

As Vice Provost, Hall was responsible for providing assistance to academic units with regard to faculty hiring, budget information, and representation of the Provost to various counsels and committees. As an *ex-officio* TAC member, Hall was responsible for scheduling, providing TAC with information relevant to their deliberations and briefing TAC on issues under consideration and Texas Tech policies and rules applicable to TAC's deliberations and decisions. Therefore, Hall's presentment of Eibeck's draft response to Phelan's grievance to TAC was within the scope of Hall's administrative responsibilities.

23

Furthermore, Hall handled issues related to all faculty affairs and she provided support for committees serving in the tenure advisory role and reviewed draft documents to assure the documents followed Texas Tech policy. The Provost's Office provided this service for all deans and department chairs on issues related to tenure such as non-reappointments. Accordingly, we find that competent summary judgment evidence established that Hall was acting within the scope of her authority when she engaged in acts complained of by Phelan.

Because the acts of Norville, Eibeck, and Hall at issue were within the duties generally assigned to them, and because Phelan has not submitted or identified any summary judgment evidence raising a genuine issue of material fact as to this element of the official immunity defense, except the November 28, 2005 e-mail, Appellants have satisfied the first prong as to all complained of acts, save and except that e-mail.

## 2. Discretionary v. Ministerial Acts

Official immunity extends to any action or decision by a state employee that is "discretionary." *Kassen, R.N. v. Hatley*, 887 S.W.2d 4, 9 (Tex. 1994). Discretionary functions receive protection while ministerial acts are unprotected. *Id*. An official duty or function is discretionary if the action involves personal deliberation, decision, and judgment. *Ballantyne,* 144 S.W.3d at 425-26. However, the test to determine whether a governmental employee's act is discretionary is not whether the employee has discretion

to perform an allegedly wrongful act, but whether the employee is performing a discretionary function when committing that act. *City of Lancaster*, 883 S.W.2d at 654.

Ministerial acts are "acts that the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." If the public official must obey an order, without having any choice of complying, the act is ministerial. *Id.*

More than fifty years ago, the Supreme Court recognized a good faith immunity for public officials charged with the discretionary duty of renewing or terminating teacher employment contracts. *Campbell v. Jones*, 153 Tex. 101, 264 S.W.2d 425, 427 (1954). *See also Dalrymple v. University of Texas System*, 949 S.W.2d 395, 400 n.2 (Tex.App.–Austin 1997) (noting that compilation of annual tenure evaluations of university professors is discretionary because it involves personal deliberation, decisions, and judgment)*, rev'd in part on other grounds*, *Brewerton v. Dalrymple*, 997 S.W.2d 212 (Tex. 1999). Furthermore, employment actions related to hiring and supervision are discretionary. *Dovalina v. Nuno*, 48 S.W.3d 279, 282 (Tex.App.–San Antonio 2001, no pet.).

## A. Norville and Eibeck

Norville and Eibeck were engaging in a discretionary function when they recommended and sought Phelan's non-reappointment. Prior to recommending Phelan's

non-reappointment, Norville and Eibeck assessed his performance and qualifications before deliberating and reaching a decision Phelan was an unlikely candidate for reappointment or tenure. Furthermore, Eibeck was involved in a discretionary act when she recommended that Phelan's Texas Tech e-mail account be disabled.

### B. Hall

Hall's presentment of Eibeck's draft response to Phelan's grievance to TAC was also a discretionary act. She was not required to present the document to TAC by any Texas Tech policy, procedure, or order of the Provost. Rather, in the process of assessing whether Eibeck's response complied with Texas Tech's policies and procedures, Hall recognized many of the issues raised by Phelan in TAC's review of his non-reappointment were addressed by Eibeck in her draft response to his grievance. Based on her review, she made a determination the document was relevant to TAC's deliberations. She then consulted with Texas Tech counsel Mellinger to obtain his opinion before exercising her discretion to present the document to TAC. Thus, Hall's decision to present the document to TAC required deliberation, decisions, and judgment.

Phelan offers nothing to rebut Appellants' summary judgment evidence except conclusory statements that an act cannot be discretionary when it is libelous, slanderous, or in violation of an employee's privacy rights. Because Phelan has not submitted or identified any summary judgment evidence raising a genuine issue of material fact as to this element of the official immunity defense, Appellants have satisfied the second prong.

26

### 3. Good Faith

To determine whether a public official acted in good faith, we apply an objective standard and inquire whether a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed at the time of the act. *Ballantyne,* 144 S.W.3d at 426. To be entitled to summary judgment, an official must prove that a reasonably prudent official might have believed the action taken was appropriate, not that it would have been unreasonable to take different action or that all reasonably prudent officials would have acted as he or she did. *Perry v. Greanias*, 95 S.W.3d 683, 697 (Tex.App.–Houston [1st Dist.] 2002, pet. denied) *citing Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 (Tex. 1997).

The standard of good faith as an element of official immunity is not a test of carelessness or negligence, legality, or a measure of an official's motivation. *Ballantyne,* 144 S.W.3d at 426-27; *Texas State Technical College v. Cressman*, 172 S.W.3d 61, 67 (Tex.App.–Waco 2005, pet. denied), *Titus Regional Medical Center v. Tetta*, 180 S.W.3d 271, 276 (Tex.App.–Texarkana 2005, no pet.). Official immunity protects "all but the plainly incompetent or those who knowingly violate the law." *McCartney, M.D.,* 50 S.W.3d at 605, *quoting City of Lancaster*, 883 S.W.2d at 656. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense. *Ballantyne,* 144 S.W.3d

27

at 428, *quoting Crawford-El v. Britton*, 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

An official's good faith may be established by the official's own affidavit. *Zuniga v. Navarro & Associates, P.C.*, 158 S.W.3d 663, 672 (Tex.App.–Corpus Christi 2005, pet. denied). However, that testimony will support summary judgment only "if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." Tex. R. Civ. P. 166a(c); *Wadewitz,* 951 S.W.2d at 466-67.

In Texas, continued employment generally depends upon the will of the employer. *Jordan v. Jefferson County*, 153 S.W.3d 670, 674 (Tex.App.–Amarillo 2004, pet. denied). As a general rule, a faculty member's employment is subject to their contract and the school's operational policies. *Bowen v. Calallen Independent School District*, 603 S.W.2d 229, 233 (Tex.Civ.App.–Corpus Christi 1980, writ ref'd n.r.e.). Unless there is a specific agreement to the contrary that dictates otherwise, a faculty member can be released for "good reason, bad reason, or no reason." *Id.* Here, Texas Tech's policies, procedures and rules clearly established that Phelan's nontenured appointment was an at-will employment pursuant to annual appointments that expired by their own terms. *See Turner v. Joshua Independent School District,* 583 S.W.2d 939, 942 (Tex.Civ.App.–Waco 1979, no writ).

28

Moreover, Texas does not recognize implied teaching contracts. *See Burris v. Willis Independent School District, Inc.*, 713 F.2d 1087, 1090-91 (5th Cir. 1983). Contrary to Phelan's assertions, the mere fact he had been rehired each year for a period of years does not constitute evidence Texas Tech had impliedly contracted with him to renew his contract every year. *See Hix v. Tuloso-Midway Independent School District*, 489 S.W.2d 706, 710 (Tex.Civ.App.–Corpus Christi 1973, writ ref'd n.r.e.). And, where a university has published written procedures governing tenure such as Regents' Rules, Faculty Handbook and Operating Procedures, the legitimacy of a claim to tenure acquired *outside* the procedures is vitiated because there is no basis for mutuality. *LaVerne v. University of Texas Systems*, 611 F.Supp. 66, 69 (D.C. Tex. 1985) (unless otherwise provided for in university rules, there is no "common law" tenure, *de facto* tenure, or tenure by default).

## A. Norville and Eibeck

Norville and Eibeck acted in good faith when they engaged in acts relating to Phelan's evaluation and non-reappointment. Likewise, Norville and Eibeck could not have acted in bad faith by depriving Phelan of due process because he received all the due process to which he was entitled. Under Texas Tech's rules on non-reappointment, Phelan was entitled to notice and the issuance of a terminal contract for one academic year. He received both. And, at his request, he received review of his non-reappointment by a faculty committee or TAC. Moreover, simply because Texas Tech provided some procedure for faculty that are non-reappointed does not mean Texas Tech intended to

29

expand by implication the employment rights of a faculty member who is non-reappointed beyond those set forth in the Regents' Rules. *See Wells v. Hico Independent School District*, 736 F.2d 243, 254-55 (5th Cir. 1984), *cert. dism'd,* 473 U.S. 901, 106 S.Ct. 11, 87 L.Ed.2d 672 (1985). Accordingly, Norville and Eibeck did not illegally deprive Phelan of any due process rights related to his non-reappointment or subsequent review by TAC.

Nor did Eibeck act in bad faith when she used the words "creep" or "dysfunctional" in her e-mail to Norville. The question of whether an alleged defamatory statement is reasonably capable of a defamatory meaning is a question of law. *Musser v. Smith Protective Services, Inc.*, 723 S.W.2d 653, 654 (Tex. 1987). The statement is construed as a whole, in light of the surrounding circumstances, based upon how a person of ordinary intelligence would perceive the statement. *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex. 2000). Bearing in mind that an expression of opinion is protected free speech, we determine whether the statements in question are merely expressions of opinion or actionable assertions of fact. *Simmons v. Ware*, 920 S.W.2d 438, 446 (Tex.App.–Amarillo 1996, no writ).

From the text of her e-mail, it is clear that Eibeck is using the word "creep" in a figurative sense to convey her criticism that Norville's statement needed to focus more on Phelan's performance and less on Phelan's behavior. In stating that Phelan's actions "reflect dysfunctional behavior," Eibeck is expressing an opinion in the popular sense as opposed to a clinical sense, and as such, is not a statement of fact. *Shaw v. Palmer*, 197

S.W.3d 854, 857-58 (Tex.App.–Dallas 2006, pet. denied) (statements that plaintiff was crazy, incompetent, and attempting to ruin the business held not defamatory).

Phelan further asserts that Eibeck acted in bad faith when she wrote, in support of her recommendation that Phelan's Texas Tech e-mail account be disabled, that Phelan had engaged in "hostile behavior." Given the surrounding circumstances, i.e. Phelan had only just sent a detailed accusatory e-mail to faculty and staff throughout the Department, followed by a second e-mail containing a veiled threat to sue other faculty members, Eibeck's statement was reasonable and justified. Moreover, Eibeck's statement was protected opinion, not a defamatory statement. Accordingly, Eibeck acted in good faith when she recommended that Phelan's Texas Tech e-mail account be disabled.

### B. Hall

Phelan contends Hall acted in bad faith when she presented Eibeck's draft response to Phelan's grievance to TAC and hand-picked TAC members who reviewed and upheld his non-reappointment. Phelan asserts Hall violated Texas Tech rules and procedures governing review of his non-reappointment when Hall presented Eibeck's draft response to TAC.

Hall's presentation of Eibeck's draft response to TAC is not prohibited by Texas Tech's rules or procedures. *See supra* note 8. In fact, there are no limitations on the evidence that may be submitted or considered by TAC. *Id*. Furthermore, she acted

responsibly when she sought advice from Texas Tech's counsel prior to presenting the document to TAC. We also reviewed the record and found no evidence that Hall "hand-picked" any of TAC's members. In fact, Texas Tech's rules require TAC's members to be elected at-large by tenured faculty. Phelan has produced no evidence that such an election did not take place. Therefore, we conclude Hall acted in good faith when she presented Eibeck's draft response to Phelan's grievance to TAC.

Because Phelan has not submitted or identified any summary judgment evidence raising a genuine issue of material fact as to this element of the official immunity defense, Appellants have satisfied the third and final prong of official immunity. Accordingly, Appellants' sole issue is sustained in part and overruled in part.

## Conclusion

Accordingly, we affirm the trial court's interlocutory order denying summary judgment in favor of Norville on Phelan's claim for libel and/or slander based upon the November 28, 2005 e-mail, reverse the trial court's order denying summary judgment in favor of Appellants on all Phelan's remaining claims, and hereby render judgment granting Appellants' motion for summary judgment that Phelan take nothing as to those remaining claims.

Patrick A. Pirtle
Justice _____